# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**NANCY M. LINSMEIER,**

    **Plaintiff,**

    **v.**                                        **Case No. 21-CV-496-SCD**

**KILOLO KIJAKAZI,**
**Acting Commissioner of Social Security,**

    **Defendant.**

---

## DECISION AND ORDER

---

Nancy M. Linsmeier applied for social security disability benefits based primarily on chronic lower back pain that radiated into her legs. After a hearing, an administrative law judge denied Linsmeier's claim, finding that her impairments were severe but not disabling. Linsmeier seeks judicial review of that decision, arguing that the ALJ erred in evaluating her subjective statements concerning her impairments and the prior administrative medical findings of the Social Security Administration's medical consultants. Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration, contends that the ALJ did not commit reversible error in denying Linsmeier's claim and that substantial evidence supports his decision. I agree with Linsmeier: the ALJ committed reversible error in evaluating her alleged symptoms. Accordingly, I will reverse the decision denying Linsmeier disability benefits and remand the matter for further proceedings.

## BACKGROUND

On April 19, 2021, Linsmeier filed this action seeking judicial review of the final decision of the Commissioner of Social Security denying her claim for disability benefits

under the Social Security Act, 42 U.S.C. § 405(g). *See* ECF No. 1. The clerk of court randomly assigned the matter to me, and all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 4, 6. Linsmeier filed a brief in support of her disability claim, ECF No. 16; Kijakazi filed a brief in support of the ALJ's decision, ECF No. 20; and Linsmeier filed a reply brief, ECF No. 23.

## I.  Medical Background

Linsmeier was born in 1966. *See* R. 163.[1] After graduating high school, she worked for years in a factory and then as a caregiver. *See* R. 238, 261–65. In 2011, Linsmeier started working full time at a family grocery market. *See* R. 55–56, 238, 246, 261–65, 272. She helped make sausage, grinded meat, cut and wrapped meat, put lunch meat out for customers, cleaned , and lifted heavy boxes. R. 56–59. Around 2016, Linsmeier began experiencing pain in her lower back that radiated down her legs. R. 39–40. She also had both knees replaced. *See* R. 774–80, 805. Linsmeier's radiating back pain persisted despite therapy and epidural steroid injections, *see* R. 776–99, so in January 2018, she reduced her hours at the grocery market to sixteen to twenty per week, *see* R. 238, 246, 262, 272–73. Linsmeier also received other accommodations from her employer like fewer and easier duties, extra help, more frequent breaks, and the option to leave early. *See* R. 262, 227–31, 272–73.

In January 2018, Linsmeier tore her left rotator cuff while lifting something at work. *See* R. 338–39, 595. After making minimal strides with physical therapy, *see* R. 352–93, 401–14, 418–37, 448–50, Linsmeier had arthroscopic shoulder surgery in April 2018, R. 450–52. She resumed physical therapy after the surgery and, as of September 2018, had more or less fully recovered. *See* R. 453–567, 688, 694, 701, 708, 715.

---

[1] The transcript is filed on the docket at ECF No. 14-2 to ECF No. 14-9.

The same could not be said for Linsmeier's back problems. In January 2018, she started seeking pain management for worsening low back pain and radiating symptoms. *See* R. 619–31. Linsmeier reported that walking and standing aggravated her pain. During her physical examination, Linsmeier exhibited tenderness in her lumbar paraspinals, limited lumbar spine range of motion due to pain, and a positive right straight leg raise. Her pain management doctor recommended a lumbar epidural steroid injection and suggested she wean off her long-term narcotic pain medication. Linsmeier received the injection a few weeks later, but it did not improve her pain. R. 644. A lumbar spine MRI from March 2018 revealed mild to moderate degenerative changes, facet hypertrophy, and concern for bilateral L4-5 nerve root encroachment and stress reaction but no significant spinal canal stenosis. R. 342–43, 953. During a physical exam that same month, Linsmeier demonstrated tenderness in her lumbar paraspinals, a positive right straight leg raise, a stable gait, intact bilateral lower extremity muscle strength, and intact sensation. R. 656.

Throughout 2018, Linsmeier continued to complain about radiating low back pain. She tried physical therapy and received additional injections, but those treatments did not provide much relief. *See* R. 394–401, 414–17, 438–47, 566–73, 722. In December 2018, Linsmeier saw a neurosurgeon for her ongoing back issues. *See* R. 722–23. She reported pain in her mid-lumbar spine that radiated down her right buttock, thigh, and knee and that was aggravated by standing and walking. On exam, Linsmeier exhibited mildly limited flexion and extension, some lower back pain with extension, a little bit of pitting edema, and diminished reflexes. The neurosurgeon reviewed the results of the March 2018 MRI and ordered further diagnostic imaging.

3

Linsmeier received the imaging results in early 2019. The EMG was unremarkable, with all measures within normal limits. R. 734–35. However, the x-ray "revealed a fairly severely collapsed disk between 5 and 1 and 4-5," as well as "some instability." R. 744. After comparing the x-ray to the March 2018 lumbar spine MRI, the neurosurgeon indicated that Linsmeier had "fairly severe facet arthropathy between 4-5 and 5-1 and a completely collapsed disk." *Id.* He noted that Linsmeier's weight was contributing to her back issues. The neurosurgeon explained that continued conservative care—including weight reduction and continuing with the pain clinic—was "the best potential option[]." *Id.* But, given Linsmeier's progressive symptoms, he also discussed the option of decompression stabilization at L4-5, L5-S1.

In May 2019, Linsmeier began treatment at a different pain management clinic. *See* R. 834. She reported ongoing low back pain with radiation into her outer thighs. R. 834. The physical exam revealed normal strength and reflexes, tenderness to palpation in the lumbar spine, no sacroiliac joint tenderness, and a negative straight leg raise. R. 837. The pain management specialist prescribed gabapentin and hydrocodone. At follow-up appointments, Linsmeier continued to complain about ongoing, radiating low back pain, and she reported using a cane more often. R. 913, 952. Despite relatively normal physical exams, the pain management specialist increased Linsmeier's hydrocodone dose in September 2019. R. 917, 954.

In addition to the left shoulder and back impairments, Linsmeier also suffered from shortness of breath, hypertension, obstructive sleep apnea, and obesity. *See* R. 604, 607, 632, 642, 719, 822, 856, 879, 886, 897, 903, 938, 940, 954, 958, 961.

4

## II.    Administrative Background

In March 2019, Linsmeier applied for disability insurance benefits, alleging that she became disabled on January 1, 2018 (that is, around the time she cut back her work hours). R. 15, 170–76. She listed several medical conditions on her disability application: chronic bilateral low back pain, right side sciatica, spondylosis with radiculopathy, supraventricular tachycardia, diastolic dysfunction, left ventricular hypertrophy, premature ventricular contraction, hypertension, and left shoulder pain. R. 237. At the time, Linsmeier was still working part time at the family grocery market. R. 237–38.

Linsmeier submitted several reports in support of her application. *See* R. 236–46, 250–59, 274–82, 283–91. She claimed that she woke up every day with back pain, took her pain medication, and went to work, where she took multiple five-minute breaks during each four-hour shift. She further claimed that, after work, she lay down for two to three hours with a massaging pad on her back to relieve her pain. As for her other daily activities, Linsmeier reported that she needed help getting dressed; she bathed and shaved sitting down; her boyfriend cooked most meals, though she could make simple sandwiches; she needed to take several breaks while performing household chores like washing the dishes, doing laundry, or vacuuming; she shopped a few times per week, though anything over an hour was too painful; she couldn't hunt, make firewood, or four-wheel anymore; she enjoyed fishing (but needed to use a chair), watching television, playing cards, and playing video games; and a few times a month she went to auctions or rummage sales. Linsmeier estimated that without a break she could sit for ninety minutes, stand for sixty minutes, and walk for ten minutes. Linsmeier further estimated that, over the course of the workday, she could sit for four hours, stand for two hours, and walk for one hour.

5

## A.    State-agency review

The Social Security Commissioner denied Linsmeier's application at the state-agency level of review. *See* R. 71–102. William Fowler, MD, reviewed the medical record initially, and Torra Jones, MD, reviewed the record upon Linsmeier's request for reconsideration. Both reviewing physicians found that Linsmeier retained the capacity for work at the light exertional level[2] if she avoided more than frequent stooping. R. 79–81, 97–98. Because the medical record referenced a history of depression and psychotropic medication, the state agency enlisted a psychologist to evaluate whether Linsmeier suffered from a medically determinable mental impairment. *See* R. 92, 95. Upon examining those records, the reviewing psychologist (Ellen Rozenfeld, PsyD) found that Linsmeier's mental impairment did not cause more than mild limitations in mental functioning. R. 94–96.

## B.    Administrative hearing

On September 29, 2020, ALJ Wayne Ritter held an evidentiary hearing on Linsmeier's disability application. *See* R. 30–70. Linsmeier testified at the hearing. *See* R. 38–55. Linsmeier told the ALJ that her radiating back pain started in 2016 and was getting worse, especially since 2018. R. 39–41, 51–52. She received five or six injections, each of which provided, at most, one day of pain relief. R. 41, 51. She also tried a TENS unit, seeing a chiropractor, physical therapy (including dry needling), a muscle relaxer, and several pain medications, but "nothing seems to help." R. 41–43, 51–52. Linsmeier indicated that her providers had discussed surgery; however, they told her that there was a twenty-five percent chance she would end up in a wheelchair if she did the surgery because she had an extra vertebra. R. 40.

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

6

Linsmeier told the ALJ that she suffered from other issues besides her back. She injured her shoulder and had surgery to repair a torn rotator cuff in April 2018. R. 46. However, according to Linsmeier, she continued to experience arm weakness despite physical therapy because the surgery did not repair a torn tendon. Linsmeier also told the ALJ that she had sleep apnea and interrupted sleep that required she nap three or four days a week. R. 49–50. Additionally, Linsmeier was obese; at the time of the hearing, she was 5'5" tall and weighed 309 pounds. R. 47.

Linsmeier testified that she tried to work notwithstanding her impairments, "[b]ut now the pain is just getting way too much." R. 40. She claimed that she couldn't handle prolonged standing and sitting. R. 40, 50–51. At the time of the hearing, she was living with her sister and nephew and working about sixteen hours a week at the family grocery market. R. 44–45, 48–49, 52–53. Linsmeier told the ALJ that she was on her feet most of the time during her four-hour shifts—wrapping meat with an automatic meat wrapper and stocking the meat on shelves for customers—which she did while holding onto a walker. R. 40, 44–46. Her employer also allowed her to sit down and take a break two to three times each shift and, if needed, leave work early. R. 40, 46, 48. According to Linsmeier, her employer allowed those accommodations because she worked at the grocery market a long time, and she was difficult to replace. R. 46. Linsmeier indicated that once or twice a week she left thirty to sixty minutes early because she was in too much pain, and she made up for the lost time by working an extra shift. R. 40, 44–45, 48–49. Linsmeier further indicated that, after each shift, she spent one to two hours lying down, using ice or a heating pad on her back, and stretching. R. 40–41, 49.

7

Linsmeier also testified about her other daily activities. She acknowledged that the activities listed in her function reports—performing household chores (with breaks), cutting the lawn with a riding mower (again, with breaks), driving, shopping, handling money, watching television, playing video games, attending auctions and rummages sales, talking with others on the phone, working part-time, and going to a cabin in the woods—were "reasonably accurate for what [she did]." R. 53–54. However, Linsmeier indicated that she had to bring a chair to the auctions so she could alternate between sitting and standing. R. 54. She also indicated that she couldn't hunt, fish, or go four-wheeling anymore. R. 53.

The ALJ also heard testimony from a vocational expert. *See* R. 55–67. The vocational expert testified that a hypothetical person with Linsmeier's age (fifty-one years old at the time of her alleged onset of disability), education (a high school graduate), and work experience (as a meat wrapper at a family grocery market) could not perform the meat wrapper job if she was limited to light work with other postural, manipulative, and environmental restrictions. R. 55–65. According to the vocational expert, that person could perform other jobs such as a cashier II, a cleaner (housekeeping), or a photocopying machine operator. The vocational expert indicated that no jobs would be available if the person could not engage in sustained work activity on a regular and continuing basis; was absent, late, or left early more than one day every other month; or required unscheduled breaks more than five percent of the workday. R. 65–66.

### C.    ALJ's decision

Applying the standard five-step analysis, *see* 20 C.F.R. § 404.1520(a)(4), on November 3, 2020, the ALJ issued a written decision finding that Linsmeier was not disabled, *see* R. 12–29. The ALJ determined that Linsmeier met the insured status requirements of the Social

Security Act through December 31, 2024. R. 18. At step one, the ALJ determined that Linsmeier had not engaged in substantial gainful activity since her alleged onset date. The ALJ determined at step two that Linsmeier had five severe impairments: disorders of the lumbar spine, degenerative joint disease of the left shoulder status post arthroscopic surgery, obstructive sleep apnea, hypertension, and morbid obesity. R. 18–19. In finding that Linsmeier's mental impairment of depression did not cause more than a minimal limitation in her ability to perform basic work activities, the ALJ noted that Linsmeier "reported some slight difficulties with self-care." R. 19 (citing R. 250–59, 283–91). At step three, the ALJ determined that Linsmeier did not have an impairment, or a combination of impairments, that met or medically equaled the severity of a presumptively disabling impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (i.e., "the listings"). R. 19–20.

The ALJ next assessed Linsmeier's residual functional capacity—that is, her maximum capabilities despite her limitations, *see* 20 C.F.R. § 404.1545(a). The ALJ found that Linsmeier had the RFC to perform a reduced range of light work. R. 20. Specifically, the ALJ found that Linsmeier could only occasionally balance; stoop; kneel; crouch; crawl; climb ramps, stairs, ladders, ropes, and scaffolds; and reach overhead with her left upper extremity. The ALJ also found that Linsmeier must avoid more than moderate exposure to pulmonary irritants. In assessing that RFC, the ALJ considered Linsmeier's subjective allegations, the medical evidence, and the medical opinion evidence and prior administrative findings. *See* R. 20–23.

The ALJ first addressed Linsmeier's subjective allegations about her impairments. He began by noting that, consistent with social security regulations and rulings, he considered "all symptoms and the extent to which [those] symptoms [could] reasonably be accepted as

consistent with the objective medical evidence and other evidence." R. 20 (citing 20 C.F.R. § 404.1529; Social Security Ruling 16-3p).[3] The ALJ then summarized the allegations contained in Linsmeier's disability report and function reports, noting that Linsmeier alleged disability based on hypertension, a left shoulder impairment, and a back impairment, R. 20 (citing R. 236–46), and claimed those impairments caused difficulty lifting, squatting, bending, standing, reaching, walking, kneeling, and climbing stairs, R. 20–21 (R. 250–59, 283–91). Based on his consideration of the evidence, the ALJ determined that the intensity, persistence, and limiting effects of Linsmeier's alleged symptoms were "not entirely consistent with the medical evidence and other evidence in the record." R. 21.

Next, the ALJ discussed the medical evidence in the record. The ALJ noted Linsmeier's 2018 shoulder injury that required arthroscopic surgery. R. 21 (citing R. 339, 358, 450, 595). However, according to the ALJ, Linsmeier did well post-surgery, though at times she did still complain about shoulder pain. R. 21 (citing R. 465, 497, 688, 694). The ALJ then discussed medical evidence relating to Linsmeier's back impairment, including complaints of radiating lower back pain, the results of the March 2018 MRI, and the unremarkable EMG from 2019. R. 21 (citing R. 343, 619, 724, 734, 913, 937, 940, 953). The ALJ also noted that Linsmeier reported using a cane to walk and that she tried physical therapy, injections, and pain medications, all with minimal relief. R. 21 (citing R. 38–55, 348, 619, 937). The ALJ acknowledged that, at times, Linsmeier had positive findings upon examination, including "a positive straight leg raise, lumbar tenderness to palpation, paraspinal lumbar tenderness, limited lumbar range of motion, pitting edema, and diminished reflexes." R. 21 (citing R. 73,

---

[3] Social security regulations define symptoms as the claimant's "own description of [her] physical or mental impairment." 20 C.F.R. § 404.1502(i).

621, 722). However, according to the ALJ, "generally [Linsmeier's] exams were normal, noting a normal gait, negative straight leg raises, full range of motion, no bony tenderness to shoulder, negative impingement sign, no clubbing, cyanosis, or edema, no obvious joint abnormalities, no lumbar tenderness, normal strength, no joint instability, and intact sensation." R. 21 (citing R. 596, 599, 604, 656, 670, 709, 722, 727, 837, 857, 903, 917, 938, 954, 958, 994). Finally, the ALJ noted that Linsmeier also suffered from hypertension, obstructive sleep apnea, and obesity. R. 22 (citing R. 607, 879, 958).

The ALJ determined that, while Linsmeier "testified that she continued to experience significant pain and limitations stemming from her impairments," her allegations were "not fully supported by the objective medical evidence or the treatment history as detailed [in the decision]." R. 22. The ALJ provided three reasons to support that finding. First, according to the ALJ, Linsmeier's exams "were generally normal." R. 21 (citing R. 596, 599, 604, 656, 670, 709, 722, 727, 837, 857, 903, 917, 938, 954, 958, 994). Second, the ALJ noted that Linsmeier "continued to work in a light exertional job, albeit part-time." R. 22 (citing R. 38–55, 224–35). Third, the ALJ indicated that Linsmeier's "most recent treatment notes continue[d] to reflect a disparity between her alleged limitations and clinical findings." R. 22 (citing R. 917, 938). The ALJ therefore concluded that the medical evidence provided "only limited support" for Linsmeier's allegations and suggested that "her symptoms were not as severe, persistent or limiting as she alleged." R. 22.

The ALJ then assessed the medical opinions and prior administrative findings in the record. Relevant here, the ALJ determined that the findings of the state-agency reviewing physicians were "generally persuasive." R. 23 (citing R. 72–84, 85–101). The ALJ concluded that their findings—that Linsmeier was capable of light work with only frequent stooping—

were supported by the exams showing "normal findings." R. 23 21 (citing R. 596, 599, 604, 656, 670, 709, 722, 727, 837, 857, 903, 917, 938, 954, 958, 994). However, according to the ALJ, the overall record—including Linsmeier's subjective complaints, imaging, surgery, and exams revealing obesity, tenderness, and diminished reflexes—demonstrated that Linsmeier had additional postural, manipulative, and environmental limitations. R. 22.

Finally, the concluded that the RFC assessment was "supported by the record when considered as a whole." R. 23. The ALJ noted that he considered the prior administrative findings of the state-agency medical consultants. The ALJ also purported to have considered Linsmeier's "daily activities, her work history, medical treating history, and her allegations and statements relating to her symptoms." *Id.* According to the ALJ, the assessed RFC sufficiently accommodated the limitations and symptoms stemming from Linsmeier's impairments.

The ALJ then continued with the sequential evaluation process. At step four, the ALJ determined that, since her alleged onset date, Linsmeier could not perform any of her past relevant work. R. 24. The ALJ determined at step five that jobs existed in significant numbers in the national economy that Linsmeier could perform. R. 24–25. Relying on the vocational expert's testimony, the ALJ mentioned three examples: cashier II, housekeeping cleaner, and photocopying machine operator. Based on those findings, the ALJ determined that Linsmeier was not disabled from her alleged onset date through the date of the decision. R. 25.

The Social Security Administration's Appeals Council denied Linsmeier's request for review, R. 2–8, making the ALJ's decision a final decision of the Commissioner of the SSA, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016).

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing. A reviewing court will reverse a Commissioner's decision "only if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

"Substantial evidence is not a demanding requirement. It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Martin*, 950 F.3d at 373 (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, I must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

## DISCUSSION

Linsmeier claims she is unable to work full time due primarily to radiating lower back pain that significantly interferes with her ability to stand or sit for long periods of time. She challenges the ALJ's conclusion that she could perform a restricted range of light work. Her

13

main argument is that the ALJ erred in assessing the intensity, persistence, and limiting effects of her alleged symptoms.

## I.      Applicable Law

ALJs use a two-step process for evaluating a claimant's impairment-related symptoms. *See* Social Security Ruling 16-3p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1119029, 2016 SSR LEXIS 4, at *3 (Mar. 16, 2016) (citing 20 C.F.R. § 404.1529). First, the ALJ must "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id.* at *5. Second, the ALJ must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit . . . her ability to perform work-related activities." *Id.* at *9. At the second step, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *9–10. When reviewing evidence other than objective medical evidence, the ALJ may consider other factors, including the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's symptoms; factors that precipitate and aggravate the claimant's symptoms; the type, dosage, effectiveness, and side effects of the claimant's medications; other treatment the claimant has received for symptom relief; and any other measures the claimant has used to relieve her symptoms. *Id.* at *18–19; *see also* § 404.1529(c)(3).

Reviewing courts "will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support."

14

*Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (quoting *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)). "A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence." *Cullinan*, 878 F.3d at 603 (citing *Murphy*, 759 F.3d at 816). "In drawing its conclusions, the ALJ must 'explain her decision in such a way that allows [a reviewing court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy*, 759 F.3d at 816 (quoting *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011)).

## II.    Analysis

Linsmeier takes issue with each of the reasons the ALJ provided for finding that the record did not fully support her alleged symptoms. First, she argues that the ALJ erred in pointing to her part-time work at the family grocery market without acknowledging the significant accommodations her employer permitted and without considering how that work affected her alleged symptoms. Second, according to Linsmeier, the ALJ did not consider her daily activities aside from her part-time job. Third, she contends that the ALJ discussed her course of treatment but failed to mention the possibility of back surgery. Finally, in Linsmeier's view, the ALJ erred when evaluating the objective medical evidence.

### A.    Part-time work

The ALJ omitted significant accommodations Linsmeier received when he concluded that her part-time job as a meat wrapper (which she performed at the light exertional level) was inconsistent with her alleged symptoms. Because Linsmeier was still working at the time she applied for disability benefits, the Social Security Administration had Linsmeier's employer fill out a work activity questionnaire. *See* R. 271–73. The owner of the family grocery market indicated that he reduced Linsmeier to sixteen to twenty hours per week so

15

that she could still do the job. He also indicated that the market assigned Linsmeier fewer or easier duties, permitted her more frequent breaks or rest periods, and provided her extra help. The owner estimated that Linsmeier was fifty percent or less as productive as other employees in similar positions and pay rates.

The ALJ did not discuss or cite the employer questionnaire anywhere in his decision. *See* R. 15–25. "Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so doing, he may not ignore entire lines of contrary evidence." *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012) (citations omitted). Here, the ALJ did not connect evidence of Linsmeier's part-time work to his conclusion that Linsmeier's alleged symptoms were not fully supported by the record. The ALJ also failed to consider that Linsmeier was able to work part-time only because her employer "tolerated frequent breaks and absences that an ordinary employer would have found unacceptable." *Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010); *see also Lanigan v. Berryhill*, 865 F.3d 558, 565 (7th Cir. 2017) (finding error where ALJ failed to acknowledge "the employer's commendable generosity" when discussing the claimant's part-time employment and "assumed that [the claimant's] work performance was no different than any other employee's"); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) (finding that ALJ failed to build a logical bridge between the claimant's "brief, part-time employment" and his conclusion that the claimant "was able to work a full-time job, week in and week out").

Kijakazi argues that the ALJ's citation of a work activity report in which Linsmeier described her job duties and special conditions of employment made up for his failure to explicitly reference the employer work activity questionnaire. The ALJ did cite the work activity report, as well Linsmeier's hearing testimony, when noting that Linsmeier "reported

16

that she continued to work in a light exertional job, albeit part-time." R. 22 (citing R. 38–55, 224–35). However, the ALJ did not mention any of the accommodations Linsmeier described in the report or at the administrative hearing. Linsmeier reported that she worked sixteen hours a week as a meat wrapper at a family grocery market and that her employer provided significant accommodations just so she could make it through each four- to five-hour shift. *See* R. 227–30. For example, she noted that her co-workers lifted anything over twenty pounds, her employer reduced her hours because she couldn't physically handle working full time, her employer allowed her to take breaks when needed, and her employer assigned her duties— like putting lunch meat on shelves—she could handle with her impairments. Linsmeier also reported that her day was shot after each work shift. R. 231. Similarly, at the administrative hearing, Linsmeier told the ALJ that she took several breaks during each work shift, she held onto a walker while wrapping the meat, she left work early once or twice a week because her pain was unbearable, and she spent hours after each shift in recovery. *See* R. 40–41, 44–46, 48–49. The information Linsmeier provided about her part-time job was consistent with the information provided by her employer, but the ALJ did not address it or connect it to his evaluation of Linsmeier's alleged symptoms.

Furthermore, evidence of Linsmeier's part-job time did not contradict her claim of disability. Unlike the claimant in *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008)—a case Kijakazi relies upon—Linsmeier did not state she was "totally disabled." Rather, Linsmeier alleged that she could not perform the standing or sitting requirements of light work on a "regular and continuing basis"—that is, "8 hours a day, for 5 days a week, or an equivalent work schedule." Social Security Ruling 96-8p, Policy Interpretation Ruling Titles II And XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, 1996 SSR LEXIS

5, at *1 (July 2, 1996). And the alleged onset date of disability corresponded with the time she reduced her work hours by fifty percent. *See* R. 170, 226–31, 237–38, 246, 262, 291. The evidence the ALJ ignored about Linsmeier's frequent breaks and subpar productivity was consistent with her alleged symptoms. Also, the evidence that Linsmeier left work early once or twice a week and spent hours recovering after each shift suggests that her limited part-time job aggravated her symptoms, *see* § 404.1529(c)(3)(iii), another factor the ALJ did not address. The ALJ did not discuss any evidence contradicting the information Linsmeier and her employer provided about the nature of Linsmeier's part-time work.

The ALJ's error with respect to Linsmeier's part-time employment may have affected his determination that Linsmeier could adjust to other work. In addition to contradicting his evaluation of Linsmeier's alleged symptoms, the evidence about her part-time job was inconsistent with his conclusion that Linsmeier could perform a restricted range of light work on a regular and continuing basis. And, based on her age, education, and past relevant work, Linsmeier likely would be disabled if she was capable of only sedentary work. *See* 20 C.F.R. § 404.1569; 20 C.F.R. Pt. 404, Subpt. P, App'x 2, Rule 201.14. Moreover, the vocational expert testified that no jobs would be available if the hypothetical person was not able to engage in sustained work activity on a regular or continuing basis or had to leave work early on average once a week. R. 65–67.

### B. Daily activities

Aside from the part-time employment, the ALJ did not discuss Linsmeier's daily activities when assessing her alleged symptoms. The ALJ briefly mentioned Linsmeier's function reports when he summarized her allegations, but he did not discuss any of the activities described in those reports. *See* R. 20–21 (citing R. 250–59, 283–91) ("The claimant

18

then filed a function report within which she stated that she had difficulty with lifting, squatting, bending, standing, reaching, walking, kneeling, and climbing stairs."). Later in the decision, as he summarized the RFC assessment, the ALJ indicated that he had "considered [Linsmeier's] reported daily activities." R. 23. But again, he did not mention any such activities. Nor did he analyze whether Linsmeier's reported activities were consistent with her allegations. Thus, the ALJ did not build an accurate and logical bridge between the evidence of Linsmeier's daily activities and his conclusion that the record did not fully support Linsmeier's alleged symptoms.

Kijakazi insists that earlier in his decision the ALJ noted that Linsmeier "reported some slight difficulties with self-care." ECF No. 20 at 11 (citing R. 19). Kijakazi concedes that that discussion came from the ALJ's step-two analysis concerning Linsmeier's alleged depression but argues that the ALJ did not need to repeat it when evaluating Linsmeier's alleged symptoms. It's true that generally "[a]n ALJ need not rehash every detail each time he states conclusions on various subjects." *Gedatus v. Saul*, 994 F.3d 893, 903 (7th Cir. 2021). (citations omitted). But in this case it's unclear whether the ALJ considered how Linsmeier's reported difficulties with self-care related to her *physical* impairments and symptoms. Linsmeier reported that she needed help getting dressed and that she bathed and shaved sitting down. *See* R. 50–51, 252, 285. Those activities appear consistent with her alleged difficulty with prolonged standing, which she claimed stemmed from her radiating low back pain and her obesity.

Also, the ALJ did not mention any of Linsmeier's other daily activities anywhere else in his decision. Linsmeier reported that her cooking was limited to making simple sandwiches; she needed to take several breaks when performing household chores like

washing the dishes, doing laundry, or vacuuming; she couldn't shop for more than an hour at a time; she couldn't hunt, make firewood, or four-wheel anymore; and she needed to use a chair when fishing. *See* R. 253–55, 286–88. She also reported that her part-time job aggravated her symptoms and that she needed to lie down and rest after each shift. *See* R. 251–52, 284, 291. And she testified to alternating between standing and sitting when attending auctions. *See* R. 54. Like the issues with self-care, those activities appear consistent with Linsmeier's claimed limitations working on her feet.

Kijakazi attempts to excuse the ALJ's failure to discuss Linsmeier's daily activities by noting that Dr. Fowler, the state-agency physician who reviewed the record initially, considered the first function report and still found Linsmeier capable of light work with no more than frequent stooping. ECF No. 20 at 11 (citing R. 81). The ALJ, however, did not mention the function report or Linsmeier's reported activities when evaluating Dr. Fowler's findings. Thus, it's unclear whether the ALJ thought that evidence supported or was consistent with Dr. Fowler's findings.

## C. Medication and other treatment

The ALJ unreasonably inferred that Linsmeier's alleged symptoms were inconsistent with the treatment she received. Despite noting that Linsmeier reported "minimal relief" with physical therapy, injections, and pain medications, R. 21, the ALJ characterized Linsmeier's treatment history as "conservative" and determined that such treatment did not fully support her allegations, R. 22. The ALJ also noted that Linsmeier's "most recent treatment notes continue[d] to reflect a disparity between her alleged limitations and clinical findings." *Id.* In support, the ALJ cited a pain management follow-up visit from September 2019 in which Linsmeier reported chronic low back pain that radiated into her right leg. R. 913, 937.

20

Linsmeier also reported that she was using a cane more often; that standing, walking, and lifting aggravated her pain; and that taking one hydrocodone pill in the morning did not help manage her pain. R. 913–14, 937. Linsmeier's physical exam was rather normal, but the pain management specialist still increased the hydrocodone dosage, advising Linsmeier to take one and a half pills in the morning and two more pills throughout the day. R. 917, 938. The ALJ failed to explain how a treatment note in which a provider responded to Linsmeier's ongoing complaints of back pain by increasing her narcotic pain medication dosage contradicted her alleged limitations.

Moreover, when discussing Linsmeier's treatment history, the ALJ never mentioned that Linsmeier's neurosurgeon presented surgery as an option to treat her back issues. Linsmeier met with the neurosurgeon in March 2019 to review her recent diagnostic imaging results. *See* R. 744. After reviewing those results, the neurosurgeon explained that "continued conservative care" (i.e., weight loss and treatment at the pain management clinic) remained Linsmeier's "best option." R. 744. However, the neurosurgeon also noted that, because Linsmeier reported ongoing symptoms despite her conservative care, there was a second option: decompression stabilization at L4-5 and L5-S1. Linsmeier told the neurosurgeon that she'd like to think about her options, and it appears she did not choose the surgery route.[4] Nevertheless, the fact that surgery was on the table demonstrates that conservative care did not effectively alleviate Linsmeier's symptoms and suggests that Linsmeier's back impairment was more severe than the ALJ acknowledged. In other words, the potential back surgery

---

[4] At the administrative hearing, Linsmeier explained that she elected not to undergo the back decompression surgery because she was told that if she did there was a chance she would end up in a wheelchair because she had an extra vertebra. R. 40.

21

undermined the ALJ's inference that Linsmeier's treatment was not commensurate with her alleged symptoms.

### D. Objective medical evidence

Linsmeier argues that the ALJ made two errors when evaluating the objective medical evidence in relation to her alleged symptoms. Linsmeier contends that the ALJ used a legally incorrect standard of review and that his use of that standard tainted his discussion of the objective medical evidence. "In determining whether an individual is disabled, [the ALJ must] consider all of the individual's symptoms, including pain, and the extent to which the symptoms *can reasonably be accepted as consistent with* the objective medical and other evidence in the individual's record." SSR 16-3p, 2016 SSR LEXIS 4, at *2–3 (emphasis added); *see also* § 404.1529. The ALJ here accurately recited the proper standard at the outset of his symptom evaluation, *see* R. 20, but later in the decision, he determined that Linsmeier's allegations were "*not fully supported by* the objective medical evidence," R. 22. Linsmeier maintains that the "not fully supported by" standard used by the ALJ in this case is more stringent than the required "reasonably be accepted as consistent with" standard because it implies that an ALJ can reject a claimant's allegations if there is *any* objective medical evidence inconsistent with her statements. He cites several cases from this district in which judges have remanded social security actions based on an ALJ's use of the wrong standard. *See* ECF No. 16 at 14–15 & n.1 (listing cases).

This argument has been raised before. In *Rooney v. Saul*, No. 18-CV-2030-SCD, 2020 WL 3533470, 2020 U.S. Dist. LEXIS 115027, at *17–18 (E.D. Wis. June 30, 2020), I reversed an ALJ's decision for several errors, including that the ALJ indicated the claimant's alleged symptoms were not "fully substantiated" by the record. Although, like in this case, the ALJ

22

recited the correct standard earlier in his decision, I determined in *Rooney* that it was unclear which standard the ALJ applied. This was so because the ALJ ignored significant evidence contrary to his conclusion that the claimant's allegations were inconsistent with the record. However, in other cases, I have affirmed an ALJ's decision that mentioned the wrong legal standard where it was clear the ALJ *applied* the correct one. *See, e.g.*, *Gulley v. Kijakazi*, No. 20-CV-1545-SCD, 2021 U.S. Dist. LEXIS 255484, at *45–47 (E.D. Wis. Nov. 17, 2021).

It is unclear whether the ALJ applied the correct standard in Linsmeier's case. The ALJ acknowledged that the treatment record revealed both positive and negative physical exam findings. For example, the ALJ noted that at times Linsmeier demonstrated a positive straight leg raise, lumbar tenderness to palpation, paraspinal lumbar tenderness, limited lumbar range of motion, pitting edema, and diminished reflexes. R. 21 (citing R. 573, 621, 722). However, according to the ALJ, the exams generally were normal. In support, the ALJ cited exams revealing a normal gait; negative straight leg raises; full range of motion; no bony tenderness to shoulder; negative impingement sign; no clubbing, cyanosis, or edema; no obvious joint abnormalities; no lumbar tenderness; normal strength; no joint instability; and intact sensation. *See* R. 21–22 (citing R. 596, 599, 604, 656, 670, 709, 722, 727, 837, 857, 874, 903, 917, 938, 954, 958, 994). But the ALJ simply listed those exam findings without discussion; he never explained why the negative exam findings outweighed the positive ones.

Moreover, the ALJ appears to have overstated the number of negative exam findings in his tallying. Several of the negative findings he referenced came from appointments unrelated to Linsmeier's main problem area, her back. *See* R. 596 (left shoulder injury), 599 (establishing general care with a new provider), 670 (shoulder injury), 709 (shoulder injury), 874 (breathing complaints), 958 (breathing complaints), 994 (preoperative evaluation

23

regarding shoulder injury). Others, like the lack of clubbing or cyanosis, are simply irrelevant to Linsmeier's impairments. The negative findings therefore do not clearly outweigh the positive ones.

Kijakazi argues that, under the substantial-evidence standard of review, no explanation was necessary; the ALJ was free to choose one side (normal exams) over the other (abnormal exams). She's right that it's the ALJ's duty to weigh conflicting evidence. But the ALJ must still build a proverbial bridge between the evidence and his conclusions. Without such support, there's no way for a reviewing court to trace the path of the ALJ's reasoning. Because the required explanation was lacking in this case, it's impossible to tell whether the ALJ applied the correct standard when evaluating Linsmeier's alleged symptoms. The decision erroneously implies that a simple tally was sufficient—the ALJ could discredit Linsmeier's allegations as long as there were more negative exam findings than positive ones.

Linsmeier also argues that the ALJ's discussion of the objective medical evidence omitted important diagnostic imaging findings. The radiologist who reviewed Linsmeier's March 2018 lumbar spine MRI indicated that the exam showed mild to moderate degenerative changes, facet hypertrophy, and concern for bilateral L4-5 nerve root encroachment and stress reaction but no significant spinal canal stenosis. R. 342–43, 953. The ALJ quoted those impressions verbatim. *See* R. 21 (citing R. 343, 953). However, the ALJ did not mention that Linsmeier's neurosurgeon interpreted the imaging results differently than the radiologist. After reviewing the 2018 MRI, as well as a more recent x-ray, the neurosurgeon concluded that Linsmeier had "fairly severe facet arthropathy between 4-5 and 5-1 and a completely collapsed disk." R. 744. It's in that same treatment note that the neurosurgeon posed the option of surgery. Although the ALJ wasn't required to recite every

24

medical finding in the record, the failure to mention and resolve the conflicting imaging evidence is another example of the ALJ ignoring evidence contrary to his conclusion that the record did not support Linsmeier's alleged symptoms.

Kijakazi argues that any error with respect to the diagnostic imaging evidence was harmless because the state-agency reviewing physicians did explicitly reference the neurosurgeon's interpretation when assessing Linsmeier's work abilities. ECF No. 20 at 9 (citing R. 79–80, 94). The Seventh Circuit has repeatedly held that administrative error like the one here is subject to harmless-error review and that remand is not required if the reviewing court "can predict with great confidence that the result on remand would be the same." *Schomas v. Colvin*, 732 F.3d 702, 707–08 (7th Cir. 2013) (citations omitted). "[T]he harmless error standard is not . . . an exercise in rationalizing the ALJ's decision and substituting [the reviewing court's] own hypothetical explanations for the ALJ's inadequate articulation." *McKinzey*, 641 F.3d at 892. Rather, the question for a reviewing court "is now prospective—can [I] say with great confidence what the ALJ would do on remand—rather than retrospective." *Id.*

I cannot say with great confidence that the ALJ would reach the same result on remand. In evaluating Linsmeier's alleged symptoms, the ALJ overlooked significant evidence that contradicted his finding that the record did not fully support her allegations and failed to explain why he credited other evidence instead. The ALJ repeated several of those mistakes when assessing the reviewing physicians' findings. Thus, those findings cannot cure the ALJ's error regarding the diagnostic imaging results.

*    *    *

Overall, the ALJ's subjective-symptom analysis lacks explanation and support in the record. The ALJ did not account for significant evidence in the record contrary to his conclusion that the record did not fully support Linsmeier's alleged symptoms, including the accommodations Linsmeier received at her part-time job, Linsmeier's other daily activities, the fact that Linsmeier's neurosurgeon presented surgery as an option to treat her back impairment, and the neurosurgeon's impression of the diagnostic imaging results. The ALJ also failed to explain how he resolved certain contradicting evidence, namely the results of Linsmeier's physical exams. And while Linsmeier's subjective allegations alone are insufficient to establish disability, other evidence in the record appears consistent with those statements. Thus, this is the rare case where the claimant has overcome the considerable deference owed to the ALJ's evaluation of her alleged symptoms.

## CONCLUSION

For all the foregoing reasons, I find that the ALJ committed reversible error in evaluating the intensity, persistence, and limiting effects of Linsmeier's subjective allegations about her impairments. Thus, I **REVERSE** the Social Security Commissioner's final decision and **REMAND** this action to the Commissioner pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for further proceedings consistent with this decision. On remand, the Commissioner should also address Linsmeier's other claimed error regarding the persuasiveness of the state-agency reviewing physicians' prior administrative medical findings.

**SO ORDERED** this 18th day of April, 2022.

_____
STEPHEN C. DRIES
United States Magistrate Judge